Deborah R. Chandler (12057)
dchandler@aklawfirm.com
Jared D. Scott (15066)
jscott@aklawfirm.com
ANDERSON & KARRENBERG
50 W. Broadway, Suite 600
Salt Lake City, UT 84101
Telephone: 801-534-1700

Steve W. Berman (pro hac vice forthcoming)
steve@hbsslaw.com
Jerrod C. Patterson (pro hac vice forthcoming)
jerrodp@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

Gerald M. Abdalla, Jr. (pro hac vice forthcoming)
jerry@abdalla-law.com
ABDALLA LAW, PLLC
602 Steed Road, Suite 200
Ridgeland, MS 39157
Telephone: (601) 278-6055

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ROXANNE SENDEJO and DANIEL MUNGUIA, individually and on behalf of all others similarly situated, <br><br>                  Plaintiffs, <br><br> vs. <br><br> FAMILY DOLLAR STORES, INC., DOLLAR TREE, INC., DOLLAR TREE STORES, INC., FAMILY DOLLAR, INC., and FAMILY DOLLAR SERVICES, LLC, <br><br>                  Defendants. | **CLASS ACTION COMPLAINT** <br> <u>**JURY DEMANDED**</u> <br><br> Case No.: 2:24-cv-00167 |

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ....................................................................1

II.   THE PARTIES .....................................................................................12

    A.    Plaintiffs .....................................................................................12

    B.    Defendants ...................................................................................13

III.  JURISDICTION & VENUE ...................................................................14

IV.   FACTUAL ALLEGATIONS ...................................................................16

    A.    FDA regulations .........................................................................16

    B.    Background on Family Dollar and Dollar Tree ...................................20

    C.    FDA warns Family Dollar about its putrid storage conditions. .............................................................................21

    D.    Family Dollar routinely and unlawfully sells adulterated drugs and medical devices ...................................................27

        1.    Adulterated sales between May 1, 2022, and July 21, 2022 ................................................................27

        2.    Adulterated sales between May 1, 2022, and August 5, 2022 ...........................................................28

        3.    Adulterated sales between May 1, 2022, and September 15, 2022 ....................................................29

        4.    Adulterated sales between June 1, 2022, and May 4, 2023 ...............................................................29

        5.    Adulterated sales between June 1, 2023, and October 5, 2023 ...........................................................30

        6.    Plaintiffs' own investigation reveals Family Dollar knew OTC medications were stored outside of acceptable temperature ranges. ..................................30

E.   Family Dollar's ongoing unlawful conduct .......................................32

F.   Injury to Plaintiffs and Class members from Family
     Dollar's unlawful conduct..............................................................35

V.   TOLLING OF THE STATUTES OF LIMITATION ..................................41

A.   Discovery rule tolling.....................................................................41

B.   Fraudulent concealment tolling.......................................................41

C.   Estoppel ..........................................................................................42

VI.  CLASS ALLEGATIONS ..............................................................................42

VII. CAUSES OF ACTION ..................................................................................47

COUNT I NEGLIGENCE ........................................................................................47

COUNT II NEGLIGENCE *PER SE* .......................................................................49

COUNT III NEGLIGENT FAILURE TO WARN....................................................51

COUNT IV NEGLIGENT MISREPRESENTATION..............................................53

COUNT V UNJUST ENRICHMENT.......................................................................54

COUNT VI BREACH OF IMPLIED WARRANTY................................................55

COUNT VII VIOLATIONS OF THE CALIFORNIA UNFAIR
     COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200,
     *ET SEQ.*) ..........................................................................................58

COUNT VIII VIOLATIONS OF THE CONSUMER LEGAL
     REMEDIES ACT ("CLRA") (CAL. CIV. CODE § 1750, *ET
     SEQ.*)..................................................................................................61

PRAYER FOR RELIEF ..........................................................................................65

Plaintiffs Roxanne Sendejo and Daniel Munguia (collectively, "Plaintiffs"), by and through their respective counsel, bring this action on behalf of themselves and all others similarly situated, against Defendants Family Dollar Stores, Inc.; Dollar Tree, Inc.; Dollar Tree Stores, Inc.; Family Dollar, Inc.; and Family Dollar Services, LLC (collectively, "Family Dollar" or "Defendants"). Plaintiffs allege the following based upon personal knowledge as to themselves, facts that are a matter of public record, and upon information and belief, as follows:

## I. NATURE OF THE ACTION

1. Family Dollar is a self-described value chain that sells over-the-counter ("OTC") drugs, medical devices, health and personal care products, and other critical household goods to millions of "lower than average income customer[s] in urban and rural locations."[1] Family Dollar acknowledges its "unique customer bases"[2] and promotes itself as the "neighborhood discount store[.]"[3] Low- and fixed-income consumers depend on Family Dollar for their daily needs, and Family Dollar promises consumers that "[w]hen it comes to delivering quality . . . Family Dollar is

---

[1] Dollar Tree, *2022 Annual Report* at 11, Mar. 10, 2023, https://corporate.dollartree.com/_assets/_94f0e7ffaf23dfcf737ba030ee70c8d8/dollartreeinfo/db/893/9552/annual_report/Dollar+Tree+-+2022+Annual+Report.pdf.

[2] *Id.* at 4.

[3] Family Dollar, *Our Brands*, https://corporate.dollartree.com/about/our-brands/family-dollar (last visited Feb. 23, 2024).

THE place to shop."[4] Family Dollar has approximately 8,200 retail stores in 48 states, along with numerous distribution centers, and is wholly-owned by Dollar Tree, Inc., a Fortune 500 company.[5]

2.      Based on the strategic placement of Family Dollar's retail stores in rural and underserved communities, consumers frequently have few or no other viable alternatives for purchasing their daily necessities. As one leading professor on the economics of dollar stores explained, "[t]he core of what dollar stores have done and really capitalized on is recognizing that there are people who really don't have other options."[6] The Institute for Local Self-Reliance, a think tank dedicated to self-sustaining communities, found that "dollar stores target low-income neighborhoods, especially Black neighborhoods, and drive out grocers and other healthy eating options."[7]

3.      In addition, as a seller of medical products, Family Dollar has a relationship of trust with its consumers who purchase these products. When describing its relationship with consumers, Family Dollar consistently asserts that "[h]elping families save on the items they need with everyday low prices creates a

---

[4] *Id.*

[5] Dollar Tree, *2022 Annual Report*, at 6-7.

[6] Brandon A. Dorgman, *How Dollar Stores Sell Low-Income People a Sense of Belonging*, Talk Poverty, Feb. 19, 2020, https://talkpoverty.org/2020/02/19/dollar-stores-sell-low-income-people-sense-belonging/index.html.

[7] *Id.*

strong bond with customers who refer to their neighborhood store as 'my Family Dollar.'"[8]

4.     Family Dollar has abused and exploited this position of trust throughout the country by unlawfully distributing and selling millions of dollars of adulterated OTC drugs and medical devices to low- and fixed-income consumers, despite having notice and knowledge that these products could not lawfully be sold, were unsafe for human use or ingestion, and were defective.  As detailed herein, these products did not meet safety, strength, quality, purity, and effectiveness requirements because they were stored in extreme temperatures that are outside of labeled temperature requirements (the "Adulterated Products" or "Products").  These requirements are so important that they are often listed on the packaging, as shown on this box of Advil:



---

[8] Press Release, *Family Dollar Grand Opening*, City News, Oct. 11, 2017, https://www.kossetexas.com/news/family-dollar-store-grand-opening.

5.      Although this case centers on the storage of Adulterated Products outside acceptable temperature ranges, problems at Family Dollar facilities have been endemic for years.  In late January 2022, following a news report showing a Family Dollar employee feeding a rat potato chips inside its West Memphis, Arkansas Distribution Center,[9] the U.S. Food and Drug Administration ("FDA") began a series of inspections at this Center and issued a scathing 22-page Inspection Report detailing the deplorable conditions it observed.[10] The FDA inspections led to the unsettling discovery of more than *1,100 dead rodents*, and a review of the company's internal records revealed the collection of "*more than 2,300 rodents between Mar. 29 and Sep. 17, 2021, demonstrating a history of infestation*."[11] The Inspection Report also revealed that Family Dollar had prior knowledge of the appalling and pervasive rodent infestation.[12] On February 18, 2022, after the FDA issued a "Safety Alert" warning the public to potentially contaminated products and announced that it had found unsanitary and dysfunctional conditions that "appear to

[9] Melissa Moon, *Another complaint about rats at Family Dollar Facilities*, WREG Memphis, Jan. 4, 2022, https://wreg.com/nes/local/another-complaint-about-rats-at-family-dollar-facilities/.

[10] FDA, *Inspection Observations*, Feb. 11, 2022, https://www.fda.gov/media/156960/download (the "Inspection Report") (attached as **Exhibit A**).

[11] FDA News Release, *FDA Alerts the Public to Potentially Contaminated Products from Family Dollar Stores in Six States*, at 2, FDA, Feb. 18, 2022, (attached as **Exhibit B**) (emphasis added).

[12] *See* Inspection Report, Ex. A, at 14 ("Specifically, your firm has documentation since at least January 2020 of rodents (mice and/or rats) within your facility.").

be violations of federal law,"[13]  Family Dollar initiated a recall[14] and temporarily closed 404 stores in six states.[15]

6.    These squalid conditions prompted a multidistrict litigation proceeding in Tennessee,[16] which resulted in a settlement for Family Dollar consumers in six states who purchased contaminated products between January 2021 and February 2022.[17] Pursuant to the settlement, Family Dollar assured consumers that it was taking steps "to prevent issues like those alleged to have occurred at the West Memphis Distribution Center from occurring in the future."[18]

7.    Finally, based on this rat infestation, on February 26, 2024, Family Dollar Stores LLC pled guilty to one count of causing FDA-regulated products to become adulterated while being held under unsanitary conditions.  Pursuant to the plea agreement, Family Dollar agreed to pay a fine and forfeiture totaling over $41.6

---

[13] FDA Safety Alert, Ex. B, at 1.

[14] Company Announcement, *Family Dollar Stores Issues Voluntary Recall of Certain FDA-Regulated Products in Six States Including Drugs, Devices, Cosmetics, Food*, FDA, *Feb.* 18, 2022, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/family-dollar-stores-issues-voluntary-recall-certain-fda-regulated-products-six-states-including (attached as **Exhibit C**).

[15] Sam Tabahriti, *Family Dollar is temporarily closing 404 stores after more than 1,000 dead rats were found in a distribution center*, Business Insider, Feb. 23, 2022, https://www.businessinsider.com/family-dollar-indefinitely-closed-stores-finding-thousands-rodents-2022-2.

[16] *See In re: Family Dollar Stores, Inc. Pest Infestation Litig.*, 22-md-03032 (W.D. Tenn.).

[17] *See* Class Action Settlement Agreement and Release, Dkt. #181, Ex. 1.

[18] *Id.* at 13.

million.  According to the U.S. Department of Justice, this is "the largest-ever monetary criminal penalty in a food safety case."[19]  As the U.S. Attorney for the Eastern District of Arkansas explained, "[i]t is incomprehensible that Family Dollar knew about the rodent and pest issues at its distribution center in Arkansas but continued to ship products that were unsafe and unsanitary.  Knowingly selling these types of products not only places the public's health at risk but [also] erodes the trust consumers have in the products they purchase."  *Id.*

8.     As a result, Family Dollar had abundant notice and knowledge that it was unlawfully storing OTC drugs and medical devices in extreme temperatures that were outside of labeled temperature requirements.[20]  The Inspection Report specifically warned Family Dollar that "**[d]rug products are not stored under appropriate conditions of temperature and humidity so that their identity, strength, quality, and purity are not affected**."[21]  The Inspection Report further stated that: "**your firm does not monitor nor control temperature or humidity within your warehouse.**  Your Facility Manager stated he has seen temperatures that can be as high as [redacted] °F in the upper parts of the Distribution Center using

---

[19]     *See*     https://www.justice.gov/opa/pr/family-dollar-stores-llc-pleads-guilty-holding-consumer-products-under-insanitary-conditions.

[20] *See* Inspection Report at 19-20.

[21] *Id.* at 19 (emphasis added).

[redacted]. He stated he does not document when he checks temperatures, and your firm has no written procedure regarding this practice."[22]

9.     Despite the scrutiny and the warnings from the FDA, Family Dollar's failures to control temperatures in its facilities has continued unabated. Since at least May 1, 2022, Family Dollar has knowingly and routinely sold adulterated products that were unsafe for human use or ingestion because they were sold outside of labeled temperature requirements.[23] The distribution and sale of these Adulterated Products to millions of unsuspecting consumers covers all states in the contiguous United States.

10.    This failure to safely store its products is highlighted by *five* separate recalls. Family Dollar admitted that its products were "stored and shipped . . . outside of labeled temperature requirements," on the following occasions:

---

[22] *Id.* at 20 (emphasis added).

[23] Kate Gibson, *Family Dollar recalls more than 400 products that were improperly stored*, CBS News, July 22, 2022, https://www.cbsnews.com/news/family-dollar-recall-fda-improperly-stored-products-rodents/; Aaron Kassraie, *Family Dollar Recalls More Health Products*, AARP, Sept. 20, 2022, https://www.aarp.org/health/conditions-treatments/info-2022/family-dollar-health-products-recall.html; Elizabeth Napolitano, *Family Dollar recalls Advil kept "outside of labeled temperature requirements"*, CBS News, May 5, 2023, https://www.cbsnews.com/news/family-dollar-recalls-advil-ibuprofen/; Lauren McCarthy, *Family Dollar Recalls Hundreds of Products Sold in 23 States*, The New York Times, Oct. 14, 2023, https://www.nytimes.com/2023/10/14/business/family-dollar-recall.html.

- Between May 1, 2022, and July 21, 2022, Family Dollar admitted that it sold 434 adulterated and unsafe FDA-regulated drugs and medical devices in thousands of its stores in 47 states.[24]

- Between May 1, 2022, and August 5, 2022, Family Dollar admitted that it sold 41 additional adulterated and unsafe FDA-regulated drugs and medical devices in 41 states.[25]

- Between May 1, 2022, and September 15, 2022, Family Dollar admitted that it sold six adulterated and unsafe FDA-regulated drugs in 11 states.[26]

- Between June 1, 2022, and May 4, 2023, Family Dollar admitted that it sold seven adulterated and unsafe FDA-regulated drugs in an undisclosed number of states.[27]

---

[24] Company Announcement, *Voluntary Recall of Certain Over-the-Counter Products*, FDA, July 21, 2022, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-products (attached as **Exhibit D**).

[25] Company Announcement, *Voluntary Recall of Certain Over-the-Counter Products Sold at Family Dollar Stores Because They Were Stored Outside of Temperature Requirements*, FDA, Sept. 16, 2022, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-products-sold-family-dollar-stores-because-they-were-stored (attached as **Exhibit E**).

[26] Company Announcement, *Voluntary Recall of Certain Colgate Products Sold at Family Dollar Stores Because They Were Stored Outside of Temperature Requirements*, FDA, Sept. 16, 2022, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-colgate-products-sold-family-dollar-stores-because-they-were-stored-outside (attached as **Exhibit F**).

[27] Company Announcement, *Family Dollar is Initiating a Voluntary Recall of Certain Over-the-Counter Drug Products Because the Products Have Been Stored*

- Between June 1, 2023, and October 5, 2023, Family Dollar admitted that it sold 291 adulterated and unsafe FDA-regulated drugs and medical devices in 23 states.[28]

11.    According to the FDA, storing these Products outside of required temperature ranges decreases the life expectancy of these drugs, medical devices, and medications. The FDA requires expiration dates on OTC drugs, and once they are stored improperly, a consumer can no longer rely on the expiration date. As the FDA explains, "[e]xpired medical products can be less effective or risky due to a change in chemical composition or a decrease in strength. Certain expired medications are at risk of bacterial growth and sub-potent antibiotics can fail to treat infections, leading to more serious illnesses and antibiotic resistance. Once the expiration date has passed there is no guarantee that the medicine will be safe and effective. If your medicine has expired, do not use it."[29]

---

*Outside of Labeled Temperature Requirements*, FDA, May 4, 2023, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/family-dollar-initiating-voluntary-recall-certain-over-counter-drug-products-because-products-have (attached as **Exhibit G**).

[28] Company Announcement, *Voluntary Recall of Certain Over-the-Counter Drugs and Medical Devices*, FDA, Oct. 10, 2023, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-drugs-and-medical-devices (attached as **Exhibit H**).

[29] FDA, *Don't Be Tempted to Use Expired Medicines*, Feb. 2, 2021, https://www.fda.gov/drugs/special-features/dont-be-tempted-use-expired-medicines.

12.    The recall notices say that customers who have purchased affected products "may return such product to the Family Dollar store where they were purchased without receipt."  But the recall does *not* say that customers will receive a full refund (as opposed to an exchange for a product that is also adulterated).  It is also illusory in that the products themselves may have been consumed, or at least not stored in their initial packaging.  Family Dollar initiates these "voluntary" recalls (following FDA's scrutiny of its storage facilities) because it knows that the cost is *de minimis* compared to the profits earned from the willful sale of adulterated products.

13.    To avoid losing millions of dollars in initial purchasing costs if it had properly quarantined, destroyed, and written off the Adulterated Products, Family Dollar repeatedly pushed these losses off on unsuspecting low- and fixed-income consumers. Family Dollar knowingly allowed these Adulterated Products to be distributed and sold to avoid massive losses and maximize profits.

14.    For three of the recalls, Family Dollar claimed that the products were "inadvertently" shipped.  But Family Dollar cannot realistically claim its shipments were "inadvertently" shipped when the storage conditions have not changed, and Family Dollar makes these illegal shipments over and over again.

15.    Under these circumstances, Family Dollar should not have sold any of the Adulterated Products from May 1, 2022, through the present (the "Class

Period"). Further, based on Family Dollar's business practices, there is a cognizable danger of recurrent violations, and it is likely that Family Dollar is currently distributing and selling, and will continue distributing and selling, adulterated products that are stored in extreme temperatures outside of labeled temperature requirements.

16.    As a result, Family Dollar knowingly and willfully mislead, deceived, and omitted material information from Plaintiffs and similarly situated consumers. Plaintiffs purchased the Products based on the reasonable belief that they were not adulterated, were safe for human use or ingestion, and met requirements as to safety, identity, strength, quality, purity, and effectiveness. Family Dollar did not disclose at the point of sale that the Adulterated Products were unfit for human consumption.

17.    As a proximate cause of Family Dollar's unlawful and unconscionable conduct, Plaintiffs and all other similarly situated consumers collectively suffered an injury-in-fact and economic damages when they purchased Products that were worthless or worth substantially less than what they paid.

18.    Accordingly, Plaintiffs bring claims related to the distribution and sale of the Adulterated Products under state laws for economic damages and equitable relief based on Family Dollar's unlawful, unfair, and deceptive business practice. Plaintiffs seek damages and equitable relief, including compensatory, statutory, and

punitive damages; injunctive relief; attorneys' fees and costs; and all other available remedies and damages as allowed by applicable law.

## II.    THE PARTIES

### A.    Plaintiffs

19.    Plaintiff Roxanne Sendejo is, and at all times relevant hereto has been, a resident of Kerman, California.  During the Class Period, Ms. Sendejo purchased various Adulterated Products, including but not limited to the following products, at Store #10017 in Kerman, California:[30]

   a)    Hylands 4kids Cold Mucus Relief 4floz

   b)    Pepto Chewtab Children Bubblegum 24ct

   c)    Colgate Total Whitening Paste 1.30z

   d)    Neosporin Plus Pain Cream .5 Oz

   e)    Crest Scope Outlast Mint Mouthwash 1ltr

   f)    Swan Mouthwash Green 250ml

20.    Plaintiff Daniel Munguia is, and at all times relevant hereto has been, a resident of Los Angeles, California.   During the Class Period, Mr. Munguia purchased various Adulterated Products, including but not limited to the following products, at Store #9201 in South Gate, California:

   (a)    Coppertone Kids Spray Sun Protection Factor 50 5.5 Ounces

---

[30] The Adulterated Products listed herein are adopted verbatim from Family Dollar's lists of recalled products.

- 12 -

(b)    Imodium Multi Symptom Caplet 12 Ct

(c)    Pepto Bismol Chew Org 30 Ct

(d)    Tylenol 8 Hour Muscle Ache and Pain Red Caplet 24 Count

(e)    Tylenol Arthritis Caplet 24ct

**B.    Defendants**

21.    Defendant Family Dollar Stores, Inc. is incorporated in Delaware and has its principal place of business located at 500 Volvo Pkwy., Chesapeake, Virginia 23320.

22.    Defendant Dollar Tree, Inc. is incorporated in Virginia and has its principal place of business located at 500 Volvo Pkwy., Chesapeake, Virginia 23320. Defendant Dollar Tree, Inc. is the parent company and owner of Family Dollar Stores, Inc. and its wholly-owned subsidiaries.

23.    Defendant Dollar Tree Stores, Inc. is incorporated in Virginia and has its principal place of business located at 500 Volvo Pkwy., Chesapeake, Virginia 23320. Defendant Dollar Tree Stores, Inc. and Dollar Tree, Inc. share the same principals.

24.    Defendants Family Dollar Stores, Inc.; Dollar Tree, Inc.; and Dollar Tree Stores, Inc. share principals, including but not limited to, Chief Executive Officer, Chief Strategy Officer, Chief Information Officer, Chief Merchandising Officer, Chief Operating Officer, Chief Legal Officer, and Senior Vice President.

25.    Defendant Family Dollar Inc. is incorporated in North Carolina and has its principal place of business located at 500 Volvo Pkwy., Chesapeake, Virginia 23320.

26.    Defendants are responsible for the unlawful storage, distribution, marketing, and selling of the Adulterated Products to consumers throughout the United States. Defendants created, negligently oversaw, and/or authorized the unlawful, unfair, grossly negligent, and/or deceptive storage, distribution, marketing, and selling of the Products.

### III.    JURISDICTION & VENUE

27.    This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332, for the following reasons: (a) some of the Class members are citizens of a state that is different from the citizenship of the Defendants; (b) the putative class size is greater than 100 persons; (c) the amount in controversy in the aggregate for the putative class exceeds the sum of $5 million, exclusive of interest and costs; and (d) the primary Defendants do not include States, State officials, and/or other governmental entities against whom the Court may be foreclosed from ordering relief.

28.    This Court has personal jurisdiction over Defendants because they are authorized to conduct and do business in Utah. Defendants are engaged in the storage, distribution, marketing, and selling of OTC drugs and medical devices to

Plaintiffs in Utah and in this District. Defendants have at least one distribution center in Utah, including in St. George, Utah, which is an 832,000-square-foot facility that "services stores in Idaho, Wyoming, Nebraska, Colorado, New Mexico, Arizona, California, Nevada, and Utah."[31] Defendants have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their storage, distribution, marketing, and selling of millions of dollars of products within the State to render exercise of jurisdiction by this Court permissible.

29.    Venue is proper in this Court under 28 U.S.C. §§ 1391(a) and (b)(2) and 28 U.S.C. § 1391(d) because Defendants regularly conduct substantial business within this District.

30.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District, namely Defendants' unlawful storage, distribution, marketing, and selling of the Adulterated Products occurred in this District, and Defendants caused financial harm to members of the putative class that reside in this District.

---

[31] *See* https://www.familydollar.com/locations/ut/st.-george/dc210/.

## IV.    FACTUAL ALLEGATIONS

### A.    FDA regulations

31.    The production, sale, and distribution of drugs[32] and medical devices[33] are regulated by the FDA, pursuant to authority granted by the Federal Food, Drug, and Cosmetic Act ("FDCA").[34]

32.    Congress intended the FDCA to "safeguard" and "protect" consumers from "dangerous products" affecting public health and safety by regulating products from the "moment of their introduction into interstate commerce all the way to the moment of their delivery to the ultimate consumer."[35] Under the FDCA, and parallel

---

[32] The FDCA generally defines the term "drug" as "(A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C)." 21 U.S.C. § 321(g)(1).

[33] The FDCA generally defines the term "device" as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is— (1) recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them, (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or (3) intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes." *Id.* § 321(h)(1).

[34] 21 U.S.C. § 301 *et seq*.

[35] *United States v. Sullivan*, 332 U.S. 689, 696 (1948).

state laws, it is illegal to adulterate a drug or medical device or to introduce into interstate commerce a drug or medical device that is adulterated.

33.    A drug is deemed adulterated if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or *holding* do not conform to or are not operated or administered in conformity with current good manufacturing practice [('cGMP')]."[36]

34.    A medical device is also deemed adulterated if it does not conform to or is not operated or administered in conformity with cGMP.[37]

35.    The cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess."[38]

36.    Any drug not manufactured in accordance with cGMPs is deemed "adulterated and/or misbranded" and may not be distributed or sold in the United States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

---

[36] 21 U.S.C. § 351(a)(2)(B) (emphasis added).

[37] 21 C.F.R. § 820 *et seq.*

[38] 21 C.F.R. § 210.1(a).

37.    Among the ways a drug may be adulterated and/or misbranded are:

a.    "if it has been prepared, packed, or held under unsanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health";[39] [or]

b.    "if . . . the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice . . . as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]"[40]

38.    Per federal law, cGMPs include "the implementation of oversight and controls over the manufacture of drugs to ensure quality, including managing the risk of and establishing the safety of raw materials, materials used in the manufacturing of drugs, and finished drug products." 21 U.S.C. § 351(j).

39.    FDA regulations require a "quality control unit" to independently test drug product manufactured by another company on contract:

There shall be a quality control unit that shall have the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated. The quality control unit shall be responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by another company.

---

[39] 21 U.S.C. § 351(a)(2)(A).
[40] 21 U.S.C. § 351(a)(2)(B).

21 C.F.R. § 211.22(a).

40.    Indeed, FDA regulations require a drug manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

41.    As detailed below, Family Dollar's failure to comply with the FDCA's clear mandates made it unlawful to introduce the Adulterated Products into interstate commerce and sell them to Plaintiffs and similarly situated consumers, as the Products were adulterated, unsafe for human use or ingestion, and defective.

42.    Family Dollar is responsible for ensuring that it complies with all applicable laws and FDA regulations regarding the storage, distribution, marketing, and sale of regulated products.

43.    Plaintiffs reference federal law in this Complaint not in any attempt to enforce it, but to demonstrate that their state-law tort claims do not impose any additional obligations on Defendants, beyond what is already required of them under federal law.

**B.    Background on Family Dollar and Dollar Tree**

44.    In 2015, Dollar Tree acquired Family Dollar for $8.5 billion.[41] The two companies merged, but as a result of cost-cutting programs, years of mismanagement, and dysfunction, Family Dollar has become Dollar Tree's "problem child."[42] Consequently, remediating logistical, storage, distribution, and other significant operational difficulties have not been adequately funded or implemented.[43]

45.    Although Defendants may claim that customers can return the Adulterated Products, Family Dollar's refund policy is limited, only allowing for three returns within a 30-day period. The policy reads as follows: "With original receipt, items will be exchanged for other merchandise item(s) or a refund will be issued in the original form of payment. Without original receipt, customers may return up to three items within a 30-day period. Items will be exchanged or refunded at the lowest advertised price. Refunds will be issued as a Family Dollar merchandise return card."[44]

---

[41] Hadley Malcolm, *Dollar Tree buying Family Dollar for $8.5 billion*, USA Today, July 28, 2014, https://www.usatoday.com/story/money/business/2014/07/28/dollar-tree-buys-family-dollar/13258861/.

[42] Nathan Bomey, *Family Dollar struggles with "problem child" woes*, Axios, July 22, 2022, https://www.axios.com/2022/07/22/family-dollar-recall-dollar-tree.

[43] *Id.*

[44] https://www.familydollar.com/return-policy

**C.    FDA warns Family Dollar about its putrid storage conditions.**

46.    In late January 2022, following a news report on the rat infestation at the West Memphis (Arkansas) Distribution Center, the FDA initiated a series of inspections and issued an Inspection Report detailing the deplorable conditions it observed at the Distribution Center.[45]

47.    On February 18, 2022, the FDA alerted the public to potentially contaminated products, including OTC drugs and medical devices, and announced that it had found unsanitary and dysfunctional conditions that "appear to be violations of federal law" at Family Dollar's West Memphis Distribution Facility.[46]

48.    According to the FDA Safety Alert, which was based on the Inspection Report's findings:

> Today, the U.S. Food and Drug Administration is alerting the public that several categories of FDA-regulated products purchased from Jan. 1, 2021, through the present from Family Dollar stores in Alabama, Arkansas, Louisiana, Mississippi, Missouri, and Tennessee may be unsafe for consumers to use. The impacted products originated from the company's distribution facility in West Memphis, Arkansas, where an FDA inspection found insanitary conditions, including a rodent infestation, that could cause many of the products to become contaminated. The FDA is working with the company to initiate a voluntary recall of the affected products.
>
> **"Families rely on stores like Family Dollar for products such as food and medicine**. **They deserve products that**

---

[45] *See* Inspection Report, Ex. A.

[46] FDA Safety Alert, Ex. B, at 1.

**are safe**," said Associate Commissioner for Regulatory Affairs Judith McMeekin, Pharm.D. "No one should be subjected to products stored in the kind of unacceptable conditions that we found in this Family Dollar distribution facility. These conditions appear to be violations of federal law that could put families' health at risk. We will continue to work to protect consumers."

This alert covers FDA-regulated products purchased from Family Dollar stores in those six states from Jan. 1, 2021, through the present. Some examples of these products include human foods (including dietary supplements (vitamin, herbal and mineral supplements)), cosmetics (skincare products, baby oils, lipsticks, shampoos, baby wipes), animal foods (kibble, pet treats, wild bird seed), **medical devices (feminine hygiene products, surgical masks, contact lens cleaning solutions, bandages, nasal care products) and over-the-counter (OTC) medications (pain medications, eye drops, dental products, antacids, other medications for both adults and children**).

Consumers are advised not to use and to contact the company regarding impacted products. The agency is also advising that all drugs, medical devices, cosmetics and dietary supplements, regardless of packaging, be discarded. Food in non-permeable packaging (such as undamaged glass or all-metal cans) may be suitable for use if thoroughly cleaned and sanitized. Consumers should wash their hands immediately after handling any products from the affected Family Dollar stores.

Consumers who recently purchased affected products should contact a health care professional immediately if they have health concerns after using or handling impacted products. Rodent contamination may cause Salmonella and infectious diseases, which may pose the greatest risk to infants, children, pregnant women, the elderly and immunocompromised people.

- 22 -

Following a consumer complaint, the FDA began an investigation of the Family Dollar distribution facility in West Memphis, Arkansas, in January 2022. Family Dollar ceased distribution of products within days of the FDA inspection team's arrival on-site and the inspection concluded on Feb. 11. Conditions observed during the inspection included live rodents, dead rodents in various states of decay, rodent feces and urine, evidence of gnawing, nesting and rodent odors throughout the facility, dead birds and bird droppings, and products stored in conditions that did not protect against contamination. More than 1,100 dead rodents were recovered from the facility following a fumigation at the facility in January 2022. Additionally, a review of the company's internal records also indicated the collection of more than 2,300 rodents between Mar. 29 and Sep. 17, 2021, demonstrating a history of infestation.[47]

49.    At that time, Family Dollar initiated a recall[48] and temporarily closed 404 stores in six states to remove all remaining contaminated products.[49]

50.    Importantly, the Inspection Report specifically warned Family Dollar that "**[d]rug products are not stored under appropriate conditions of temperature and humidity so that their identity, strength, quality, and purity are not affected**."[50]

51.    The Inspection Report further stated that:

Specifically, **your firm does not monitor nor control temperature or humidity within your warehouse**. Your

---

[47] *Id*. at 1-2 (emphasis added).

[48] *See* Company Announcement, Ex. C.

[49] Tabahriti, *supra* note 15

[50] Inspection Report, Ex. A at 19.

firm stores drug products on various levels within the warehouse where temperatures can exceed [redacted] °F at the floor level during the summer months and reach higher temperatures in the upper levels of the warehouse.

Your Facility Manager stated he has seen temperatures that can be as high as [redacted] °F in the upper parts of the Distribution Center using [redacted]. He stated he does not document when he checks temperatures, and **your firm has no written procedure regarding this practice**.

We observed several drug products that were labeled with storage temperatures of 20-25°C (68-77°F) with some stating to "protect from moisture", "avoid high humidity" and/or "avoid excessive heat". These products include Extra Strength Tylenol Rapid Release Gelcaps, Family Wellness brand Maximum Strength Cold & Flu softgels, and Good Sense brand Omeprazole Delayed Release Tablets 20mg.[51]

52.    Based on the February 2022 Inspection Report, Family Dollar had irrefutable notice and knowledge that it was violating FDA regulations and placing the safety and health of its consumers at risk by storing these Products at extreme temperatures outside of labeled temperature and humidity requirements.

53.    The squalid conditions prompted a criminal investigation by the U.S. Attorney's Office in the Eastern District of Arkansas.[52] Family Dollar disclosed that the grand jury subpoena requested information related to "pests, sanitation and

---

[51] *Id.* at 20 (emphasis added).

[52] Shannon Stapleton, *Dollar Tree discloses federal grand jury subpoena over pest issue*, Reuters (Mar. 15, 2022), https://www.cnbc.com/2022/03/15/dollar-tree-discloses-federal-grand-jury-subpoena-over-pest-issue-.html.

compliance with law regarding certain of our procedures and products."[53]   On February 26, 2024, Family Dollar Stores LLC pled guilty to one count of causing FDA-regulated products to become adulterated while being held under unsanitary conditions.  Pursuant to the plea agreement, Family Dollar agreed to pay a fine and forfeiture totaling over $41.6 million.  According to the U.S. Department of Justice, this is "the largest-ever monetary criminal penalty in a food safety case."[54]  As part of the plea agreement, Family Dollar admitted that "no later than January 2021, some Company employees were aware that the sanitation conditions at [the West Memphis distribution facility, "DC202"] were such that FDA-regulated products became adulterated and were shipped to Family Dollar stores.  Despite this, however, [Family Dollar] did not take adequate steps to prevent adulteration of FDA-regulated product while it was being held for sale at DC202 or to cease shipping adulterated FDA-regulated products from DC202 in interstate commerce."[55]

---

[53] Dollar Tree 10-K Annual Report, at 20, https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000935703/000093570322000020/dltr-20220129.htm.

[54] *See* Office of Pub. Affairs, Dep't of Justice, *Family Dollar Stores LLC Pleads Guilty to Holding Consumer Products under Insanitary Conditions, Agrees to Pay $41.675 Million in Connection with Rodent-Infested Warehouse*, Feb. 26, 2024, https://www.justice.gov/opa/pr/family-dollar-stores-llc-pleads-guilty-holding-consumer-products-under-insanitary-conditions.

[55] *See* Plea Agreement at 9-10, *United States v. Family Dollar Stores, LLC*, No. 24-cr-00001 (E.D. Ark. Feb. 26, 2024), ECF No. 19.

54.    The events also gave rise to a multidistrict litigation proceeding in Tennessee,[56] which resulted in a settlement for Family Dollar consumers in six states who purchased contaminated products between January 2021 and February 2022.[57]

55.    On November 8, 2022, the FDA also sent a "Warning Letter"[58] to then-CEO of Dollar Tree, Michael Witynski, regarding conditions observed during the February 2022 inspections.[59]

56.    The Warning Letter once again warned Family Dollar that "[y]our firm should investigate and determine the causes of any violations and take prompt actions to correct any violations and bring the products into compliance. It is your responsibility to ensure that your firm complies with all requirements of federal law, including FDA regulations."[60]

---

[56] *See In re: Family Dollar Stores, Inc. Pest Infestation Litig.*, 22-md-03032 (W.D. Tenn.); *see also* Consolidated Class Action Complaint, Ex. E.

[57] *See* Class Action Settlement Agreement and Release, Dkt. #181, Ex. 1.

[58] The FDA issues warning letters to alert individuals or firms that the agency has identified "violations of regulatory significance" and to request corrective action, with the expectation that most recipients will voluntarily come into compliance with the law. *See* FDA Regulatory Procedures Manual § 4-1-1 (June 2022), available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-manuals/regulatory-procedures-manual.

[59] Edmundo Garcia, *WARNING LETTER*, FDA, Nov. 8, 2022, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/dollar-tree-inc-629509-11082022 (attached as **Exhibit I**).

[60] *Id.* at 8.

57.     Yet, even after the release of the Inspection Report and Warning Letter, the eventual departure of its senior management team, including its CEO, and a federal grand jury investigation, Family Dollar continues its unlawful, unfair, and deceptive business practices by introducing into interstate commerce and selling Adulterated Products that are stored in extreme conditions, outside of labeled temperature requirements, to millions of unsuspecting consumers throughout the country.

**D.     Family Dollar routinely and unlawfully sells adulterated drugs and medical devices.**

**1.     Adulterated sales between May 1, 2022, and July 21, 2022**

58.     Between May 1, 2022, and July 21, 2022, Family Dollar unlawfully introduced into interstate commerce and sold 434 self-described adulterated and unsafe FDA-regulated drugs and medical devices to unsuspecting consumers in thousands of its stores in 47 states that Family Dollar disclosed "were stored and inadvertently shipped . . . outside of labeled temperature requirements."[61]

59.     Adulterated Products included, among many others, Tylenol, Advil, Benadryl, Aleve, Claritin, Bayer, Pepcid, Orajel, Motrin, Afrin, Miralax, Imodium, Excedrin, Pepto Bismol, Milk of Magnesia, Alka Seltzer, Swan, Natureplex, Guardian, Dr. Scholls, Vicks, Purell, Cortizone, Robitussin, Systane, DayQuil and

---

[61] Company Announcement, Ex. D, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-products.

NyQuil; sleep-aid, anti-diarrhea, and laxative medications; eye ointments and drops; oral care products; and children's medications, such as Tylenol Infant Drops, Zarbees Natural Baby Cough and Mucus Relief Syrup, Zyrtec Children's Grape, Hyland's for Kids Cold & Mucus Relief, and Children's Motrin Bubblegum Syrup.[62]

### 2. Adulterated sales between May 1, 2022, and August 5, 2022

60.     Between May 1, 2022, and August 5, 2022, Family Dollar unlawfully introduced into interstate commerce and sold 41 self-described adulterated and unsafe FDA-regulated drugs and medical devices to unsuspecting consumers in thousands of its stores in 41 states that Family Dollar disclosed "were stored and inadvertently shipped . . . outside of labeled temperature requirements."[63]

61.     Adulterated Products included numerous name-brand pregnancy tests, such as VeriQuick, First Response, and Clearblue; latex lubricated condoms, such as Trojan, Skyn, and LifeStyles; Preferred UTI test strips, Clear Eyes Contact Lens Drops; Fixodent and Poligrip denture adhesive creams; New Skin Liquid Bandage; Dentemp Onestep dental repair fillers, At Home marijuana drug test strips; and Curad First Aid Kits.[64]

---

[62] *Id.* at 4-14.

[63] Company Announcement, Ex. E, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-products-sold-family-dollar-stores-because-they-were-stored.

[64] *Id.*

### 3. Adulterated sales between May 1, 2022, and September 15, 2022

62.    Between May 1, 2022, and September 15, 2022, Family Dollar unlawfully introduced into interstate commerce and sold six self-described adulterated and unsafe FDA-regulated drugs to unsuspecting consumers in thousands of its stores in 11 states that Family Dollar disclosed "were stored and shipped . . . outside of labeled temperature requirements."[65]

63.    Adulterated Products included an assortment of oral care products including toothpastes and mouthwashes.[66]

### 4. Adulterated sales between June 1, 2022, and May 4, 2023

64.    Between June 1, 2022, and May 4, 2023, Family Dollar unlawfully introduced into commerce and sold seven self-described adulterated and unsafe FDA-regulated drugs to unsuspecting consumers in thousands of its stores in an undisclosed number of states that Family Dollar disclosed "were stored and shipped . . . outside of labeled temperature requirements."[67]

---

[65] Company Announcement, Ex. F, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-colgate-products-sold-family-dollar-stores-because-they-were-stored-outside.

[66] *Id.*

[67] Company Announcement, Ex. G, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/family-dollar-initiating-voluntary-recall-certain-over-counter-drug-products-because-products-have.

65.    Adulterated Products included an assortment of Advil tablets, caplets, dual action caplets, liquid gel, and liquid gel minis.[68]

**5.    Adulterated sales between June 1, 2023, and October 5, 2023**

66.    Between June 1, 2023, and October 5, 2023, Family Dollar unlawfully introduced into commerce and sold 291 self-described adulterated and unsafe FDA-regulated drugs and medical devices to unsuspecting consumers in thousands of its stores in 23 states[69] that Family Dollar disclosed "were stored outside of labeled temperature requirements . . . and inadvertently shipped to certain stores . . . ."[70]

67.    Adulterated Products included an assortment of Advil tablets, caplets, dual action caplets, liquid gel, and liquid gel minis.[71]

**6.    Plaintiffs' own investigation reveals Family Dollar knew OTC medications were stored outside of acceptable temperature ranges.**

68.    Plaintiffs' own investigation has confirmed not only that the inadequate storage conditions are endemic, but that Family Dollar's corporate officers were well aware of the problem because they monitored the temperature at their facilities.  For

---

[68] *Id.*

[69] AL, AR, AZ, CA, CO, FL, GA, ID, KS, LA, MS, MT, ND, NE, NM, NV, OK, OR, SD, TX, UT, WA, and WY.

[70] Company Announcement, Ex. H, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/voluntary-recall-certain-over-counter-drugs-and-medical-devices (emphasis added).

[71] *Id.* at 4-11.

example, a former store manager ("SM") who worked at Family Dollar through Fall 2022 told Plaintiffs' investigator that the delivery trucks were not temperature controlled. SM has personal experience with this issue because SM's responsibilities included unloading the trucks. From this experience, SM observed that the delivery trucks (which included all products, including OTC medications) would be sweltering in the summer months, with no cooling system or cooling fan. The products were stored in black plastic totes, which in the summer were hot to the touch. The totes themselves also contained no cooling mechanism.

69.    In addition, when air conditioning units broke at Family Dollar stores, the company allowed the stores to stay open for days even when the temperatures inside the stores rose to uncomfortable levels, including what SM estimated was 100-degree heat. In the winter months, when the heating unit broke, the store would stay open, despite cold temperatures that compelled SM and SM's employees to work with their coats on.

70.    SM also stated that the employees or managers did not have the ability to set temperatures at their stores; they were set and controlled remotely by the corporate office. SM confirmed that Family Dollar did not have a policy that required managers to pull any OTC medication or medical devices from the shelves in extremely hot or cold conditions, even though the employees would pull food products like chocolate from the shelves because they were melting in the heat. SM

was never told, formally or informally, about the need to store OTC medications and medical devices within certain prescribed temperature ranges.

71.    SM does not recall being informed about any recalls affecting SM's stores, even though there were at least *two* recalls on OTC medications and medical devices that covered SM's stores during SM's employment. *See supra* § IV.D.(1)-(5).

72.    Another worker at the St. George, Utah distribution center confirmed that, until recently, there was no temperature control system in the distribution center.  Temperatures at the distribution center exceeded 100 degrees in the summer.

73.    Yet another district manager in California and Nevada confirmed that his/her stores received products from the St. George, Utah distribution center, and the semi-trailer trucks that delivered OTC medications were not temperature-controlled.  The products would sit in the trucks often for a day or more, in addition to the time spent in transport, and the temperature would reach triple digits in his/her area.  The air conditioning would often fail during the summer, and "you'd have chocolate melting at the checkouts because it was so hot."  Family Dollar refused to close the stores in those situations.

**E.    Family Dollar's ongoing unlawful conduct**

74.    Family Dollar had a duty and an obligation to properly (a) store the regulated Products at labeled temperature requirements; (b) inspect its facilities,

including its warehouses and distribution centers, to ensure that effective control measures were being taken to prevent the improper storage and sale of the Products; (c) quarantine and destroy Adulterated Products; (d) prevent the Adulterated Products from being placed in the stream of commerce and sold; (e) warn consumers that the Products could not lawfully be sold, were adulterated, were unsafe for human use or ingestion, and did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness, and (f) fully advise customers of their rights to a refund.

75.    As detailed herein, Family Dollar had notice and knowledge that it was (a) not properly storing the Products at labeled temperature requirements; (b) not inspecting its warehouses and distribution centers to ensure effective control measures were being taken to prevent the improper storage and sale of the Products; (c) not quarantining and destroying Adulterated Products; (d) not preventing the Products from being placed in the stream of commerce and sold; (e) not warning consumers that the Products could not lawfully be sold, were adulterated, were unsafe for human use or ingestion, and did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness, and (f) not properly informing customers of their rights to a refund.

76.    Family Dollar willfully allowed, negligently oversaw, and/or authorized the unlawful business practices, and otherwise concealed material

information from Plaintiffs and all other similarly situated consumers to avoid massive losses and to maximize profits.

77.    Instead, and in order to avoid losing millions of dollars in initial purchasing costs had it properly quarantined, destroyed, and written-off the Adulterated Products, Family Dollar repeatedly pushed these losses off on unsuspecting low- and fixed-income consumers. Family Dollar knowingly allowed these Products to be distributed and sold and willfully turned a blind eye by failing to implemen practices and procedures to prevent these Products from being "inadvertently" shipped and sold.  Family Dollar would then "recall" the products that it deliberately sold, knowing full well that the refunds issued would be minimal.

78.    Plaintiffs and all other similarly situated consumers unknowingly absorbed Family Dollar's massive losses by purchasing Adulterated Products that could not lawfully be sold, were unsafe for human use or ingestion, and were defective as they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

79.    Family Dollar knowingly and willfully mislead, deceived, and omitted this material information from Plaintiffs and similarly situated consumers. Plaintiffs purchased the Products based on the reasonable belief that they were not adulterated, were reasonably safe for human use or ingestion, and met requirements as to safety, identity, strength, quality, purity, and effectiveness. Plaintiffs would not have

- 34 -

purchased the Products had they known they were adulterated, unsafe for human use or ingestion, and defective.

80.    Through its misconduct, Family Dollar unlawfully reaped millions of dollars on the backs of unsuspecting low- and fixed-income consumers by knowingly introducing the Adulterated Products into the stream of commerce and selling them.

## F.    Injury to Plaintiffs and Class members from Family Dollar's unlawful conduct

81.    Plaintiffs, and similarly situated consumers, each suffered an injury-in-fact when they purchased Products that could not legally be sold and had no economic or legal value.

82.    Plaintiffs did not receive the benefit of the bargain when they paid money to purchase what they believed were lawful, safe, and effective products, and in return, received unlawful and Adulterated Products that were worthless or worth substantially less than what they paid.

83.    Plaintiffs unknowingly purchased, used, and/or ingested Products that Congress judged insufficiently safe for human use or ingestion, and thus the Products were worthless and had no value.

84.    No reasonable consumer would expect Family Dollar to store these Products outside of labeled temperature requirements. Furthermore, no reasonable consumer would purchase Products that were stored outside of labeled temperature

requirements or pay full retail value for these Products. At a bare minimum, a reasonable consumer would expect that Family Dollar stored these Products at labeled temperature requirements.

85.    Family Dollar's fraudulent omissions were material for inducing Plaintiffs to purchase the Products. But for Family Dollar's fraudulent omissions, Plaintiffs would not have purchased the Products or would not have paid full retail value for them.

86.    Despite notice and knowledge, Family Dollar knowingly omitted material information regarding its unlawful business practices from all marketing, advertising, promotion, or other contacts with Plaintiffs, and all others similarly situated consumers, prior to and during each sale.

87.    Because Family Dollar knowingly failed to disclose material information and failed to correct or stop its unlawful business practices, Plaintiffs and all others similarly situated consumers purchased Products they would otherwise not have purchased, paid significantly less to purchase the Products, or purchased the Products elsewhere.

88.    Family Dollar's deceptive business practices and omissions induced Plaintiffs, and members of the public, to purchase the Products (or to purchase more of them) and/or to pay more for them.

89.    Each Plaintiff paid full retail price for these brand name Products. Under the circumstances, no sales of these Products should have ever taken place, and Plaintiffs did not receive the benefit of the bargain, have suffered an injury-in-fact, and have been damaged.

90.    Family Dollar's competitors, such as Walmart, Dollar General, or Walgreens, store regulated products within labeled temperature requirements. Those products are safe for human use or ingestion and meet requirements as to safety, identity, strength, quality, purity, and effectiveness. Thus, there were safer alternatives, and Plaintiffs would have purchased these Products from Family Dollar's competitors, but for its concealment and omissions.

91.    Based on Family Dollar's statements that the Products should have been "quarantine[d] and discontinue[d] [from] sale" it is clear that the products could not be lawfully sold and had no value.[72]

92.    Even if the Products had any value, that value was substantially diminished because the Products were unsafe for human use or ingestion and failed to meet safety standards and were of a lesser strength, identity, quality, purity, and effectiveness than represented.

---

[72] *See* Exs. D–H ("Family Dollar has notified its affected stores asking them to check their stock immediately and to quarantine and discontinue the sale of any affected product.").

93.    Any suggestion that Family Dollar properly offered consumers a means to return the Products is erroneous. At a bare minimum, Family Dollar has an obligation to notify as many customers as possible about the recalls. Upon information and belief, Family Dollar deliberately prevented notice from reaching its customers in order to avoid paying refunds for the Adulterated Products.

94.    Family Dollar has the resources to notify customers if it chose to do so. Family Dollar has, at a minimum, 15 million customers that it can connect to instantly through its Family Dollar Smart Coupons®, which gives consumers news about new products, coupons for saving money, etc. According to Family Dollar, "[i]n early 2021, we introduced our new retail media network, Chesapeake Media Group, which offers our partners the ability to instantly connect with shoppers, including the more than 15 million users registered in the Family Dollar Smart Coupons® program, contributing to purchase decisions in real time."[73] Upon information and belief, this network did not send out notifications regarding recalls or advise customers of a possible refund.

95.    Family Dollar also has at least 15 million email addresses of customers which it could have used to advise customers about recalls and a possible refund.

---

[73] *See* Dollar Tree, *A New Chapter, 2021 Annual Report*, at 4, Apr. 11, 2022, https://corporate.dollartree.com/_assets/_e019a55beaa640d513e0240de36a677a/dollartreeinfo/db/893/9106/annual_report/DT_2021_Form+10-K_FINAL_5.11.22.pdf.

Upon information and belief, customers were not notified by email or through any other source of contact information Family Dollar maintains. Nor did Family Dollar post information about the recalls in visible areas at its retail stores where customers would have seen it.

96.    Further, the actual recalls are fraught with pitfalls that prevent customers from receiving a refund. Each recall requires customers to "return such products to the Family Dollar Store where they were purchased. . . ."[74] Yet, because these were consumable products, most customers no longer have the actual products or packaging materials necessary to qualify for a refund. Further, none of the recalls list the stores where the Adulterated Products were sold. In fact, the May 4, 2023 recall doesn't even list the states where the products were sold. Moreover, Family Dollar conspicuously omits the words "for a full refund" in all recalls, leading many customers to believe that upon returning the Adulterated Product they would only receive the same identical adulterated product they are returning.

97.    Finally, the sheer number of products listed in the recalls (approximately 779) makes it highly unlikely that a reasonable consumer would spend substantial amounts of time attempting to determine if the products they purchased were recalled. Family Dollar does not provide customers with any way of

---

[74] Company Announcement, Exs. D–H.

searching for a product beyond reviewing all 779 recalled products line by line. To make matters worse, the lists also include shorthand descriptions of certain products (e.g., "A H" instead of "Arm & Hammer"; "NPX" instead of "Natureplex"; "Crst" instead of "Crest"; and "DRTALBOT" instead of "DR. TALBOT").

98.     Because of Family Dollar's actions, any recall was a *de minimis* expense in comparison to the millions of dollars of Adulterated Products Family Dollar knowingly and willfully sold to unsuspecting consumers.

99.     As an immediate, direct, and proximate result of Family Dollar's unlawful and unfair conduct, misrepresentations, and omissions, Family Dollar injured Plaintiffs and Class members, in that Plaintiffs and Class members:

a.     purchased Products that were adulterated, could not lawfully be sold, and were unsafe for human use or ingestion, and therefore, are worthless;

b.     paid more for Products based on Family Dollar's false representations, omissions, and deception;

c.     purchased Products they otherwise would not have purchased, had they not been deceived;

d.     purchased Products that they otherwise would not have purchased, had they known the truth about improper storage practices, and the safety and quality issues of the Products;

e.     were not given adequate notice or opportunity to obtain a refund or could not get a refund for the Products purchased; and/or

f.     were deprived of the benefit of the bargain because the Products they purchased were adulterated, had no value, or had less value than what was represented.

## V.    TOLLING OF THE STATUTES OF LIMITATION

### A.    Discovery rule tolling

100.    Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that the Products they purchased were unlawfully sold by virtue of being stored outside of labeled temperature requirements within the period of any applicable statutes of limitation.

101.    Within the period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing that the Products were adulterated, unsafe, and defective by virtue of being stored outside of labeled temperature requirements. Thus, all applicable statutes of limitation have been tolled by operation of the discovery rule.

### B.    Fraudulent concealment tolling

102.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment of the facts alleged herein throughout the period relevant to this action.

103.    Plaintiffs and the other Class members justifiably relied on Family Dollar to disclose that the Products were adulterated by virtue of being stored outside of labeled temperature requirements, and because this was hidden and not discoverable through reasonable efforts by Plaintiff and the other Class members,

the running of all applicable statutes of limitation have been suspended with respect to any of Plaintiffs' and other Class members' claims.

## C.    Estoppel

104.    Defendants were under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Adulterated Products.

105.    Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Products from consumers, as well as the fact that the Products could not lawfully be sold and that storage of the products outside of labeled temperature requirements systematically devalued the Products.

106.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## VI.    CLASS ALLEGATIONS

107.    Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals (the "Class") pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law, consumer protection, and other statutory laws of the states listed below, on behalf of the following class:

> All persons who purchased an Adulterated Product from a Family Dollar store in California from May 1, 2022, through the present.

108.   Excluded from the Class are consumers who allege personal bodily injury resulting from the use of an Adulterated Product. Also excluded are Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

109.   The class definitions identify unnamed Class members by describing a set of common characteristics sufficient to allow a member of that group to identify themselves as having a right to recover damages from Defendants. Other than direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class through notice published online through internet posting and/or publication.

110.   Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief pursuant to common law and the state consumer protection laws identified herein.

111.   Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose subclasses, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

112.  <u>Numerosity—Fed. R. Civ. P. 23(a)(1)</u>. The Class is comprised of tens of thousands of individuals who were Defendants' customers, the joinder of which in one action would be impracticable. The exact number or identification of the Class members is presently unknown. The identity of the Class members is ascertainable and can be determined based on Defendants' business records.

113.  <u>Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3)</u>. The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

    a.    Whether Defendants engaged in the unlawful conduct alleged herein;

    b.    Whether Defendants owed a duty of care to Plaintiffs and Class members;

    c.    Whether Defendants' representations in advertising, marketing, storing, distributing, and/or selling were unlawful, false, deceptive, and/or misleading;

    d.    Whether Defendants mislead Plaintiffs and Class members about its unlawful sales;

    e.    Whether Defendants' representations deceived Plaintiffs and Class members;

    f.    Whether Defendants were unjustly enriched by their unlawful conduct;

    g.    Whether Defendants' actions violate state consumer protection laws;

    h.    Whether the Adulterated Products fail under an implied warranty;

i.    Whether Plaintiffs and Class members are entitled to declaratory and injunctive relief;

j.    Whether (and in what amount) Defendants' conduct economically injured Plaintiffs and Class members; and

k.    Whether Plaintiffs and Class members are entitled to the recovery of punitive damages (and in what amount).

114.   Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Class. Identical statutory violations and business practices are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

115.   <u>Typicality—Fed. R. Civ. P. 23(a)(3)</u>. Plaintiffs' claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the class. Further, there are no defenses available to Defendant that are unique to Plaintiffs or to any particular Class members.

116.   <u>Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1)</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interest incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

117.  <u>Predominance —Fed. R. Civ. P. 23(b)(3)</u>. Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

118.  <u>Superiority—Fed. R. Civ. P. 23(b)(3)</u>. A class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Plaintiffs and members of the Class have suffered irreparable harm as a result of Defendants' unlawful, unfair, fraudulent, and deceptive conduct. Because of the size of the individual Class members' claims, no Class Member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

119.  Plaintiffs do not anticipate any difficulty in the management of this litigation.

## VII.   CAUSES OF ACTION

## COUNT I

## NEGLIGENCE

120.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

121.   At all times relevant herein, Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in the marketing, quality control, storage, distribution, and selling of the Adulterated Products, including a duty to follow FDCA requirements by storing the Products within labeled temperature requirements, and by not selling the Adulterated Products.

122.   Defendants also owed a duty to Plaintiffs and Class members not to unlawfully sell the Products that were unsafe for human use or consumption and defective.

123.   Defendants also owed a duty to Plaintiffs and Class members to advise them of their right to a refund, and to ensure that stores carried out the refund program.  The recalls are otherwise meaningless if Plaintiffs and Class members are not advised of their rights to a refund.

124.   Defendants breached their duties to Plaintiffs and Class members by (a) unlawfully storing the Products outside of labeled temperature requirements; (b) unlawfully selling the Adulterated Products that were not safe for human use or

consumption; (c) marketing, storing, distributing, selling, and warranting Adulterated Products which did not meet safety standards and were of a lesser strength, identity, quality, purity, and effectiveness than was represented to Plaintiffs and Class members; (d) failing to take those steps necessary to discontinue storing and/or selling the Adulterated Products to consumers, and (e) failing to adequately advise customers of their rights to a refund.

125. Despite the ability and means of the Defendants to properly store, distribute, and sell products that met FDCA requirements as to safety, identity, strength, quality, purity, and effectiveness, Defendant failed to do so.

126. When Plaintiffs and Class members purchased the Adulterated Products, they were unaware that the Products could not lawfully be sold and were therefore unsafe for human use or consumption and lacked the identity, strength, quality, purity, and effectiveness as were marketed by Defendants.

127. After their purchase, and following the recalls, Plaintiffs and Class members were unaware of their rights to a refund, and Family Dollar was negligent in executing its own recall program.

128. As a direct and proximate cause of the foregoing, Plaintiffs and Class members have suffered, and will continue to suffer, damages and economic loss as described herein.

129.   Plaintiffs and the Class members are entitled to damages in an amount to be determined at trial.

## COUNT II

### NEGLIGENCE *PER SE*

130.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

131.   Defendants owed a duty to Plaintiffs and Class members to abide by all applicable federal and state statutes, laws, and regulations regarding regulated products.

132.   Defendants had a duty to comply with 21 U.S.C. § 331, *et seq.*, which prohibits the introduction of adulterated products into interstate commerce. *See* FDCA, 21 U.S.C. § 331.

133.   In particular, the FDA-regulated products held by Defendants at their warehouses and distribution centers were adulterated through Defendants' actions of storing these products outside of labeled temperature requirements, introducing them into interstate commerce, and selling the Adulterated Products in violation of 21 U.S.C. § 331, *et seq*. *See* 21 U.S.C. § 351.

134.   Additionally, Defendants violated the States' respective consumer protection statutes[75] by, among other things: 1) willfully concealing that the affected

---

[75] *See* Cal. Bus. & Prof. Code § 17200, *et seq.*; Cal. Civ. Code § 1750, e*t seq*.

Products were stored outside of labeled temperature requirements; 2) willfully selling Adulterated Products that could not lawfully be sold and were therefore unsafe for human use and consumption; 3) failing to disclose and actively concealing that the Adulterated Products could not lawfully be sold and did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness; 4) representing that the Adulterated Products had characteristics, uses, benefits, and qualities which they did not have; 5) representing that the Adulterated Products are of a particular standard, quality and grade when they are were not; 6) intentionally and knowingly misrepresenting material facts regarding the Adulterated Products; and (7) failing to advise customers of their rights to a refund.

135.    The fact that Defendants failed to comply with FDCA requirements, and similar state statutes regarding product safety, identity, strength, quality, purity, and effectiveness is evidence that Defendants breached their duty of reasonable care and is negligence *per se*.

136.    Plaintiffs and Class members were in the class of people intended to be protected by these statutes regarding product safety. Defendants' failure to comply with these statutes was a direct and proximate cause of Plaintiffs' and Class members' injuries and damages.

137.    Plaintiffs and Class members suffered injury and damages as a direct and proximate result of Defendants' acts and omissions constituting negligence *per se*.

## COUNT III

## NEGLIGENT FAILURE TO WARN

138.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

139.    Defendants, as the seller of the Adulterated Products, had a duty to Plaintiffs and the Class to exercise the same degree of care, diligence, and skill to adequately warn and/or instruct them that the Adulterated Products could not lawfully be sold, were unsafe for human use or consumption, did not meet requirements as identity, strength, quality, purity, and effectiveness, and were not fit for their intended purpose as other sellers would have exercised.

140.    Defendants negligently failed to warn that the Products could not lawfully be sold, were unsafe for human use or consumption, did not meet requirements as to identity, strength, quality, purity, and effectiveness, and were not fit for their intended purpose. Specifically, the improper storage practices, unlawful sales, and safety risks to Plaintiffs and Class members. Such negligent conduct was a proximate cause of injuries sustained by Plaintiffs and the Class.

141.   Defendants were in a position superior to that of Plaintiffs and the Class to be aware of the conditions and qualities of the Adulterated Products, as set forth herein. Thus, Defendants had an obligation to inform Plaintiffs and the Class of their improper storage practices and unlawful sales practices. Further, Defendants had a superior opportunity to inspect its warehouses and distribution centers and become aware of the improper storage practices over and above Plaintiffs and the Class.

142.   The absence of adequate warnings and instructions caused injury-in-fact and damages to Plaintiffs and the Class that the Defendant knew or should have known about in the exercise of ordinary care. Defendants breached said duty, and negligently failed to warn Plaintiffs and the Class of the improper storage practices and unlawful sales practices.

143.   Plaintiffs and Class members would not have purchased the Adulterated Products had they known the truth about the unlawful sale of the Adulterated Products and that the Adulterated Products were unsafe for human use or consumption, and were defective.

144.   As a direct and proximate cause of the foregoing, Plaintiffs and Class members have suffered and will continue to suffer damages.

## COUNT IV

## NEGLIGENT MISREPRESENTATION

145.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

146.   The acts and omissions of Defendants described herein were done with conscious disregard of the rights of Plaintiffs and Class members.

147.   These representations were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase the Products.

148.   Defendants made identical misrepresentations and omissions to members of the class regarding the Products. Defendants should have known their representations to be false and had no reasonable grounds for believing them to be true when they were made.

149.   By and through such negligent misrepresentations, Defendants intended to induce Plaintiffs and those similarly situated to purchase the Products.

150.   Plaintiffs and those similarly situated relied to their detriment on Defendants' negligent misrepresentations. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) the Products.

151.    Plaintiffs and those similarly situated have suffered economic damages. In particular, Plaintiffs seek to recover on behalf of themselves and those similarly situated the full price paid for the worthless Adulterated Products.

## COUNT V

## UNJUST ENRICHMENT

152.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

153.    As a result of Defendants' wrongful and deceptive conduct alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of money paid by the Plaintiffs and members of the Class when they purchased the Adulterated Products.

154.    In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Class.

155.    As a result, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

156.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

157.    Defendants either knew or should have known that the payments rendered by Plaintiffs and Class members were given and received with the expectation that the Adulterated Products would have the qualities, characteristics,

and suitability for use represented by Defendants and that ordinarily pass in the trade. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

158.    The financial benefits derived by Defendants from obtaining and retaining Plaintiffs' property rightfully belongs to Plaintiffs and members of the Class.

159.    Defendants failed to advise customers of their rights to a refund, thereby allowing Defendants to retain the profits of their ill-gotten gains.

160.    Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and Class members.

161.    Plaintiffs and Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## COUNT VI

## BREACH OF IMPLIED WARRANTY

162.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

163.    Plaintiffs bring this Count on behalf of all persons who are members of the Class.

164.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

165.   The Adulterated Products are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiffs and Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

166.   Each Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

167.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

168.   There was a sale of goods from Defendants to Plaintiffs and Class members.

169.   As set forth herein, Defendants marketed, distributed, and sold the Adulterated Products, and prior to the time the Adulterated Products were purchased by Plaintiffs and Class members, Defendants impliedly warranted to them that they were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made on the Adulterated Products' packages and labels, which they did not.

170.   Plaintiffs and Class members relied on Defendants' promises and affirmations of fact.

171.   Contrary to these representations and warranties, the Adulterated Products were not fit for their ordinary use and did not conform to Defendants' representations.

172.   Defendants breached the implied warranties by knowingly selling to Plaintiffs and Class members products that did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness and were not fit for their intended purpose.

173.   Defendants were on notice of this breach, as they were aware the Adulterated Products were not stored within labeled temperature requirements and did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

174.   Plaintiffs and Class members are the intended beneficiaries of Defendants' implied warranties and Plaintiffs and Class members did not alter the Adulterated Products.

175.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered actual damages in that they purchased the Adulterated Products that are worthless or worth less than the price they paid and that they would not have purchased any of the products had they known the actual quality of the Adulterated Products.

## COUNT VII

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200, *et seq.*)

176.   Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

177.   Plaintiffs bring this Count on behalf of Class members against Defendants.

178.   California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

179.   Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the members of the Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues, Defendants violated the UCL.

180.   Defendants owed Plaintiffs and Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

a.   Possessed exclusive knowledge of the condition of the Adulterated Products;

b.      Intentionally concealed the foregoing from Class members; and/or

c.      Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from Class members that contradicted these representations.

181.   Defendants failed to reveal facts that were material to Plaintiffs and the members of the Class's decisions to purchase the Products, and Defendants intended that Plaintiffs and members of the Class would rely upon the omissions.

182.   In addition, Defendants failed to adequately advise Plaintiffs of their right to a refund pursuant to the recalls.

183.   For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements, and that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

184.   Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

185.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

186.   Plaintiffs and members of the Class were deceived by Defendants' claims that, *inter alia*, that "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

187.   Defendants' actions impact the public interest because Plaintiffs and members of the Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception.

188.   Had Plaintiffs and members of the Class known the truth about the Products, they would not have purchased the Products.

189.   Plaintiffs and the Class seek monetary relief against Defendant in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because Defendant engaged in aggravated and outrageous conduct with an evil mind. Indeed, Defendant carried out despicable conduct with willful and conscious disregard of the rights of others. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT VIII

## VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA")
### (Cal. Civ. Code § 1750, *et seq.*)

190.  Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

191.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

192.  Plaintiffs bring this Count on behalf of the Class members against Defendants.

193.  Each Defendant is a "person" under Cal. Civ. Code § 1761(c).

194.  Plaintiffs and Class members are "consumers" as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Adulterated Products.

195.  The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer . . . ." Cal. Civ. Code § 1770(a).

196.  Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the members of the Class, acting reasonably under the circumstances, to their detriment by failing to reveal the truth about improper storage practices and/or safety and quality issues, Defendants violated the UCL.

197.    Defendants owed Plaintiffs and Class members a duty to disclose the truth about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products because Defendants:

      a.    Possessed exclusive knowledge of the condition of the Adulterated Products;

      b.    Intentionally concealed the foregoing from Class members; and/or

      c.    Made incomplete representations about the safety, identity, strength, quality, purity, and effectiveness of the Adulterated Products, while purposefully withholding material facts from Class members that contradicted these representations.

198.    Defendants failed to reveal facts that were material to Plaintiffs and members of the Class's decisions to purchase the Products, and Defendants intended that Plaintiffs and members of the Class would rely upon the omissions.

199.    In addition, Defendants failed to adequately advise Plaintiffs and Class members of their right to a refund pursuant to the recalls.

200.    For example, in the course of Defendants' business, Defendants concealed and suppressed material facts, including that the Products were stored outside of labeled temperature requirements, and that they did not meet requirements as to safety, identity, strength, quality, purity, and effectiveness.

201.   Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products met requirements as to safety, identity, strength, quality, purity, and effectiveness.

202.   Yet, as demonstrated herein, Defendants engaged in a pattern of unsafe and unsanitary holding practices of its Products. Thus, Defendant knew or should have known that its Products were held in a manner which do not meet ordinary and reasonable consumer expectations and were unfit for use.

203.   Plaintiffs and members of the Class were deceived by Defendants' claims that, *inter alia*, that "[w]hen it comes to delivering quality . . . Family Dollar is THE place to shop."

204.   Defendants' actions impact the public interest because Plaintiffs and members of the Class were injured in exactly the same way as thousands of others purchasing Products as a result of and pursuant to Defendants' generalized course of deception.

205.   Had Plaintiffs and members of the Class known the truth about the Products, they would not have purchased the Products.

206.   Under Cal. Civ. Code § 1780(a), Plaintiffs and Class members seek monetary relief against Defendants for the harm caused by Defendants' violations of the CLRA as alleged herein.

207.    Under Cal. Civ. Code § 1780(b), Plaintiffs and Class members seek an additional award against Defendants of up to $5,000 for each Plaintiff who qualifies as a "senior citizen" or "disabled person" under the CLRA. Defendants knew or should have known that their conduct was directed to one or more Plaintiffs or Class members who are senior citizens or disabled persons. Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more Plaintiffs or Class members who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

208.    Plaintiffs also seek punitive damages against Defendants because their unlawful conduct constitutes malice, oppression, and fraud under Cal. Civ. Code § 3294.

209.    Plaintiffs and Class members seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, costs of court, and attorneys' fees under Cal. Civ. Code § 1780(e). and any other just and proper relief available under CLRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this case be certified and maintained as a class action and for a judgment to be entered upon Defendants as follows:

A.     Certify the Class as proposed herein, designating Plaintiffs as Class representatives, and appointing undersigned counsel as Class Counsel;

B.     Award economic and compensatory damages on behalf of Plaintiffs and all Class members;

C.     Award all actual, general, special, incidental, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.     Award treble damages pursuant to law, and all other actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

E.     Order injunctive relief, compelling Defendants to cease their unlawful actions and to account to Plaintiffs for their unjust enrichment;

F.     Award reasonable attorneys' fees, reimbursement of all costs for the prosecution of this action, and pre-judgment and post-judgment interest; and

G.     Grant such other and further relief this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action so triable.

DATED: March 1, 2024.

**ANDERSON & KARRENBERG**

/s/ *Deborah R. Chandler*
Deborah R. Chandler
Jared D. Scott
50 W. Broadway, Suite 600
Salt Lake City, UT 84101
Telephone: 801-534-1700

Steve W. Berman
(*pro hac vice* forthcoming)
steve@hbsslaw.com
Jerrod C. Patterson
(*pro hac vice* forthcoming)
jerrodp@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Gerald M. Abdalla, Jr.
(*pro hac vice* forthcoming)
**ABDALLA LAW, PLLC**
602 Steed Road, Suite 200
Ridgeland, MS 39157
Telephone: (601) 278-6055
jerry@abdalla-law.com

*Attorneys for Plaintiffs and the Proposed Class*
*Counsel for Plaintiff*